# MAX FOOT AND OTHERS v. YORKSHIRE FIRE INSURANCE COMPANY, LTD.[1]

June 23, 1939.

No. 31,952.

[1]Reported in 286 N. W. 400.

*Heitmann, McCabe, Gruber & Clure,* for appellants.
*George H. Spear,* for respondent.

HOLT, JUSTICE.

Suit on a fire insurance policy. Findings in favor of defendant. Motion in the alternative for amended findings or a new trial was denied. Plaintiffs appeal from the judgment.

The first four paragraphs of the findings of fact are satisfactory to plaintiffs, the substance of which are that in July, 1936, plaintiffs entered into an arrangement whereby Fendel, the father-in-law of Goldstein, was to advance or loan the money needed to buy job lots of merchandise to be resold for profit, the title to the goods to be in Foot, who guaranteed the repayment to Fendel of the money advanced. Alpert was to do the buying and selling. Goldstein guaranteed that Foot would repay Fendel. The business was to. be conducted under the name of Northwestern Jobbers. After Fendel was repaid the sums loaned, the profits reaped were to be divided into three equal parts, one of which was to go to Fendel, one to Alpert, and one to Foot and Goldstein in equal shares. Plaintiffs, except Alpert, were stockholders of a corporation operating the Reliable Cut-Rate Drug Company, at 212 West Superior street, Duluth, Minnesota. The basement of the drugstore fronted Michigan street, and the business of plaintiffs was started. therein in August, 1936. But the drug company desired to lease the basement to others, and so Foot, about the first of December, 1936, rented a store, No. 110 West First street, about two blocks from the drug company store, moved the stock of merchandise to the new location during the first days in December, 1936, and on the third of the month obtained the policy in suit, insuring the contents in No. 110 West First street against loss from fire in the sum of $3,000.

Foot, the owner of the property insured, was asked to give the market value thereof on December 29, 1936, before the fire. Defendant's objection of no foundation laid was sustained. This raises the first assignment of error. An owner of property may

as a rule testify as to its value without any particular foundation being laid. 2 Dunnell, Minn. Dig. (2 ed. & Supps.) § 3322, and cases cited in note 4. But when the question of the market value of the property was put it did not appear that Foot had any real knowledge of what was in the store at the time or of the market value of such goods. He seemed to have left the whole matter to Alpert and Goldstein. His entire testimony in respect to the stock of goods insured was such that the trial court could not go wrong when insisting that a reasonable foundation be laid as to his knowledge of the goods upon which he was to place either a value or a market value. Plaintiffs cite Baldinger v. Camden F. Ins. Assn. 121 Minn. 160, 141 N. W. 104; but that case is readily distinguishable. There the owners had for years lived in the building and had installed the ovens, which were the principal fixtures damaged by the fire in the building. Not so here where Alpert and even Goldstein, according to Foot, knew more than he concerning the property and its market value. Nor were plaintiffs prejudiced by the ruling, for later in his testimony Foot stated that the salvage brought $250, and on cross-examination he was asked this question: "But in any event the stock is claimed to be worth about $3,000 at the time of the fire, and the indebtedness was $6,000, or thereabouts? A. Well, if you take it that way, but I said we got some back" (some of the $6,000).

The next assignment of error in the trial was the rejection of the adjuster Altman's estimates of value of the insured property before and after the fire. In the manner the record shows the ruling we cannot see that plaintiffs were prejudiced. Altman had testified to inability to make an inventory of the goods damaged by the fire, but that from invoices furnished by Alpert and with Alpert's assistance a claim of loss, or inventory, was made up. Then this question was asked:

"Have you an opinion as to what the reasonable market value was of that inventory stock of goods?

A. "Yes.

Q. "Can you give what that is?

Mr. Spear: "That is objected to, there is no foundation laid.

The Court: "I understand that question is intended to cover the entire inventory.

Mr. Clure: "Yes.

The Court: "We will take an answer. You may answer it.

A. "I would say that from a wholesale cost at which the merchandise was bought anywhere from 25 to 30 per cent below the market.

Q. "Then, if I understand you correctly, the total cost on your inventory there would be about 25 or 30 per cent below what the reasonable market value of that list of goods would be in Duluth at that time?

A. "Yes, sir.

Mr. Spear: "The same objection.

The Court: "Objection sustained."

No good reason for granting a new trial because of this ruling appears. Moreover, the so-called inventory made was received in evidence.

Error is assigned upon the refusal to strike a certain part of the cross-examination of plaintiff Fendel (Record, folio 467) in respect to various fires in buildings and businesses in St. Paul in which he had been interested. Fendel's testimony as to his connection with the Reliable Cut-Rate Drug Company at Duluth, and with plaintiffs' enterprise as Northwestern Jobbers, and the money loaned or advanced the latter was so startling, unsupported as it was by any writing or account books, that a most searching cross-examination was called for. He claimed to have advanced upwards of $4,000 in a business venture to be handled by Alpert, a total stranger to all, upon the oral guarantee of repayment by Foot and Goldstein, yet he admitted that he well knew that both Foot and Goldstein were financially irresponsible. And the doubts engendered by the inconsistent and in many respects unbelievable testimony of Foot and Goldstein, in relation to Fendel's part, also justified the extended cross-examination of all these witnesses as to collateral matters to test their credibility. We think no error occurred in

the entire cross-examination of plaintiff Fendel which necessitates a new trial.

The fifth, sixth, and seventh paragraphs of the findings of fact are attacked as unsupported by the evidence and contrary thereto. These are:

"5. That on December 29, 1936, while said policy was still in force, a fire occurred upon the said premises and some of the contents insured by the policy above referred to were totally destroyed, and some were damaged as a result of said fire; that said fire was of incendiary origin; that the amount of said insurance was greatly in excess of the actual cash value of said stock of merchandise that was in said store at the time of said fire; that the evidence offered and received herein is insufficient to enable the court to determine with any accuracy the amount of the loss as a result of said fire, but the loss claimed by plaintiffs as a result of said fire is grossly in excess of the value of any merchandise and fixtures which were destroyed and damaged by said fire; that no books of account were kept by plaintiffs from which any accurate or dependable finding can be made as to the purchases and sales made by said plaintiffs in the conduct of said novelty store; and that plaintiff Joseph Alpert was the only person who could have testified with any accurate knowledge as to the amount and character of said purchases and sales, and he was not present at the trial.

"6. That on June 9, 1937, plaintiffs gave due notice of proof of loss as required by the terms of said policy, but the amount of loss claimed in said proof of loss was grossly excessive.

"7. That for the reasons herein above stated said policy was void at the time of said fire."

The burden was upon plaintiffs to prove the loss. To do so competent proof was required of the value of the property insured in the store at the time the fire broke out and the value thereof after it was extinguished. The record clearly demonstrates that the only person who had any personal knowledge of what was in the store when the fire took place was plaintiff Alpert, and he was not at the trial. The insured property was a stock of merchandise,

bought in small job lots by Alpert and sold in the same way by him, and also at retail in 110 West First street for 20 days before the fire. No books of account were kept. Alpert's reports of sales and purchases to Goldstein and the latter's notation thereof in a so-called book cannot be considered at all, for even Goldstein admits it not to be understandable unless Alpert was at hand to explain the entries made. That the fire was incendiary was satisfactorily proved by deputy fire marshal Martin A. Nelson, who spent three days investigating the fire and examining the stock damaged at the instance of Duluth authorities. Of course, that the fire was of incendiary origin did not void the policy unless traceable to the insured, Foot. Barich v. Pennsylvania F. Ins. Co. 191 Minn. 628, 255 N. W. 80. Alpert, however, by both pleading and proof is so connected with the other plaintiffs and with the loss from the fire that inferences in the findings of fact might properly be drawn from his absence at the trial. He had the key to the store. He locked the store at about noon on the day of the fire. Only Mrs. Fink, a relative of Fendel's, testified at the trial. There were two other employes, but they were not called. Mrs. Fink gave no reason for closing the store at noon. Alpert had departed for Minneapolis when the fire broke out at about 8:30 in the evening. That Alpert deliberately padded the proof of loss, or inventory, made by Altman, we think well established. That an attempt to defraud the insurer had its inception when the policy was obtained and persisted up to the trial is the inference from the findings quoted. In their business careers Fendel and Goldstein had been repeatedly afflicted with fires doing damage to insured properties which they owned or were interested in. It may be also noted that Fendel and Alpert, as a side issue, had a business arrangement by which the former loaned the latter money to buy job lots in paints and other goods shipped to Fendel's home in St. Paul and stored in his garage until disposed of. Some such goods were concededly shipped to Fendel from Duluth after the policy issued and prior to the fire. In fact a waybill was received in evidence showing the shipment to Fendel of 84 packages or cartons on December 9, 1936, but nothing is shown as to their contents or value. Evidence was re-

ceived of Alpert's statement that the account he kept of the sales from the stock at 110 West First street had been destroyed by the fire, yet Mrs. Fink, who was trusted with the keys when Alpert was not there, testified she saw no such account book, and the proof is in accord that there was no evidence of any fire in the front part of the store where the cash register was and where the goods were displayed for sale. A small book or memorandum Alpert made use of when Altman made the so-called inventory was not produced at the trial. Without any more reference to the record, we state that the findings above quoted appear to us abundantly justified by the evidence.

Plaintiffs' last contention is thus stated:

"It appears that the trial court necessarily in this case based its findings complained of, and its conclusions of law and order for judgment upon the following grounds:

"(1)   That the fire was incendiary;

"(2)   That the goods were fraudulently overvalued;

"(3)   That by reason of (1) and (2) the policy was void."

We, however, think the trial court considered the wilful padding of the proof of loss as the most cogent fact leading to that conclusion. Alpert's absence is also significant. The other plaintiffs knew how vital his testimony was to a recovery because of their admitted ignorance of the status of the property insured at the time of the fire. Yet no application for a continuance because of Alpert's absence was made.

The suggestion is made that the memorandum attached to the order denying a new trial indicates that the learned trial court erroneously failed to accept uncontradicted competent evidence of value of the stock at hand before the fire—that of Matze, who had sold most of the job lots to Alpert. The trial court after stating that the fact remains that the facts were found against plaintiffs, proceeds:

"If there were any substantial evidence as to the value of the amount of the loss, the court would not hesitate to name a figure within a reasonable twilight zone as the value of the loss. Mr.

Matze's familiarity with the amount or value of the stock was not at all complete or dependable except as to a comparatively small percentage of the loss claimed. Mr. Altman's figures are based on Alpert's word, and the court does not accept Alpert's word as entitled to any credit. On the record we have, any attempt to fix the value of the loss at any specified figure would be nothing but a guess and courts are not allowed to guess. As Fendel and Alpert are two of the plaintiff partners, no court would be disposed to strain the rules to find some way to enrich them at the expense of even an insurance company."

In this we concur. Foot cannot on the amended complaint and the testimony of Fendel and Goldstein separate himself from the consequences of Alpert's doings in respect to the stock covered by the insurance and the claimed loss from the fire. Upon the findings made, the defendant must prevail. It would be of no value to the profession to discuss the authorities cited by the parties, for no case has been found where the record is comparable to that in the instant case.

The judgment is affirmed.

MR. JUSTICE HILTON, being incapacitated by illness, took no part.

[1]Reported in 286 N. W. 404.